UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

DEEVINE J. COLON

                Plaintiff,

v.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                Defendant.

**REPORT AND
RECOMMENDATION**

11-CV-00210 (A)(M)

## INTRODUCTION

This case was referred to me by Hon. Richard J. Arcara to hear and report in accordance with 28 U.S.C. §636(b)(1) [9].[1] Before me are the parties' cross-motions for judgment on the pleadings pursuant to Fed. R. Civ. P. ("Rule") 12(c) [15] [16]. For the following reasons, I recommend that defendant's motion for judgment on the pleadings [16] be denied and that plaintiff's motion [15] be granted in part and denied in part.

## BACKGROUND

Plaintiff (d.o.b. 8/29/89) received disability benefits as a minor (T13).[2] He filed an application for continuation of his entitlement to child's insurance benefits as a

---

[1]      Bracketed references are to CM/EMF docket entries.

[2]      "T" refers to the certified transcript.

disabled adult child on October 27, 2006 (id). When this claim was denied (T13, 67-70), he

also filed a new application for Supplemental Security Income benefits ("SSI") (T13, 89).

On January 27, 2009, a hearing on both claims was held before Administrative

Law Judge William E. Straub on January 27, 2009 (T13, 22-55). Plaintiff was represented at

the hearing by Deborah A. Olszowka, Esq. (T13).[3] On February 20, 2009, ALJ Straub issued

a decision denying plaintiff's claim (T20). ALJ Straub's determination became the final

decision of the Commissioner when the Appeals Council denied plaintiff's request for review

(T1-3).[4]


## A.  THE ADMINISTRATIVE RECORD

### 1.  Medical Evidence

#### a.  Treatment History

##### i.  Barbara Stouter, M.D.

Dr. Stouter, of the Amherst University Health Center, treated plaintiff from

November 12, 2003 to February 15, 2008 (T141-157, 269-288). In her January 16, 2006

progress notes, Dr. Stouter stated that plaintiff had "[c]hronic flat feet causing chronic low-

grade back and leg pain" (T146). On November 16, 2006, Dr. Stouter noted that plaintiff

suffered from "depression/ anxiety, [gastroesophageal reflux disease ("GERD")] and

medically treated, asthma under good control. Learning disabled with some unrealistic

---

[3]     The hearing transcript identifies plaintiff's attorney as Deborah "Ozoken" (T22).

[4]     The Notice of Appeals Council Action is undated (T1-3).

expectations for his future" (T143). Dr. Stouter prescribed Prozac for plaintiff's depression and anxiety, but noted on December 7, 2006, that his "[a]nxiety and depression [had not improved] with low-dose Prozac. Continued weight loss which is very concerning. Abrasion on his hand secondary to punching a punching bag" (T282). Dr. Stouter also noted plaintiff's GERD was "improving with Prevacid" (id.).

On May 23, 2007, Dr. Stouter noted that plaintiff had stopped taking Prozac and Prevacid (T277). At that time, plaintiff was "not feeling sad or depressed or suicidal. His stomach is a lot better today" (id.). Dr. Stouter noted that plaintiff's asthma is a "little bit worse right now", and that he continues to have chronic problems with his back, knees and legs (id.). Dr. Stouter noted that "[c]urrently he reads at about a second or third grade level" (id.). Her February 15, 2008 progress notes indicate that plaintiff's chronic problems were "Anxiety State Nos, Depressive Disorder Nec", "Esophageal Reflux", and "unspec asthma w/ acute exacerba" (T269).


### ii.    Sheila Figliotti, LCSW-R

Ms. Figliotti, a family counselor, provided family counseling to plaintiff regarding his separation from his father and his father's death (T159, 297). She counseled plaintiff from 2002 through January 2008 (T159, 297). During "the first couple of years . . . [plaintiff] had significant delay in the areas of understanding and expressing language", but "he has demonstrated growth in these areas since high school" (T159).

### b. Consultative Examinations

#### i. Dr. Samuel Balderman, M.D.

Dr. Balderman performed a consultative pediatric examination of plaintiff on December 18, 2006 (T160-169).[5] Dr. Balderman noted that plaintiff had a history of "[d]epression, learning disabilities, and asthma", has been treated by a mental health specialist once every two weeks, and had been in therapy for depression for six years (T160).

Dr. Balderman reported that plaintiff "relates to the examiner . . . in an age-appropriate way. The child appeared to have normal attention span for age" (T161). Dr. Balderman diagnosed plaintiff with depression, asthma, learning disabilities, and fetal maternal drug exposure (T163). Dr. Balderman suggested that plaintiff "avoid environments which trigger active airway disease", but noted that "plaintiff has no other physical limitations" (id). He also indicated that plaintiff was "still being treated for depression", and that his "learning disabilities appear to be significant" (id).

#### ii. Dr. Renee Baskin, Ph.D.

Dr. Baskin completed both a "Child/Adolescent Psychiatric Evaluation" and a "Child/Adolescent Intelligence Evaluation" of plaintiff on December 18, 2006 (T170-177). Dr. Baskin reported that plaintiff's attention, concentration, and his recent and remote memory were "intact and age- appropriate" (T172). Dr. Baskin estimated plaintiff's cognitive intellectual functioning "to be in the below average to borderline range" (id). She concluded

---

[5]     Dr. Balderman described plaintiff as a female, which appears contrary to the other aspects of the record (T160).

that his "cognitive difficulties do not preclude his ability to function in an academic setting" (T176).

Dr. Baskin diagnosed plaintiff with "Learning disorder, NOS", "Depressive disorder, NOS", "Anxiety disorder, NOS", "Borderline intellectual functioning", "asthma", "Bone, muscle or joint problem (knees). History of frequent and severe ear infections. Complaints of leg, knee and stomach pain" (T177).

According to Dr. Baskin, plaintiff "would be able to attend to, follow and understand age-appropriate directions, complete age-appropriate tasks, adequately maintain appropriate social behavior, respond appropriately to changes in the environment, learn in accordance to cognitive functioning, ask questions and request assistance in an age-appropriate manner, be aware of danger and take needed precautions and interact adequately with peers and adults on a consistent basis" (T172). Dr. Baskin concluded that, "[t]he results of the evaluation appear to be consistent with psychiatric and cognitive problems but, in itself, this does not appear to be significant enough to interfere with plaintiff's ability to function on a daily basis" (T176-177).

### c.   State Agency Review

#### i.   Psychiatric Review and Mental Residual Functional Capacity

M. S. Rahman, M.D., a state agency reviewing physician, completed a Psychiatric Review Technique (T230-243) and a Mental Residual Functional Capacity Assessment of plaintiff on March 15, 2007 (T244-247). Dr. Rahman found plaintiff to be

"mildly limited" in "restriction of activities of daily living", had "difficulties in maintaining social functioning", and was "moderately limited" "in maintaining concentration, persistence or pace" (T240). Dr. Rahman noted that plaintiff did not experience repeated episodes of deterioration, each of extended duration (id.).

Dr. Rahman concluded that, "[a]s per psych CE on 12/18/06, his MSE are fairly intact. As per special ed. teachers [*sic*] report on 2/2/07, [plaintiff] has very little difficulties when the task is easy but when the task is slightly challenging he attempts to avoid the tasks, he functions at a much higher rate of independence in the area of math and struggles in all other academic areas due to low reading ability. Based on the available MER, plaintiff appears able to understand and follow simple directions and perform simple rote tasks in low contact and low demand settings" (T246).

### ii.    Physical Residual Functional Capacity

C. deFreitas[6], a state agency disability analyst, completed a physical residual functional capacity assessment on March 16, 2007 (T248-253). Plaintiff's primary diagnosis was asthma, with a secondary diagnosis of "LD" and fetal maternal drug exposure (T248). No postural, manipulative, visual limitations, or communicative limitations were noted (T249-251).

Plaintiff had the residual functional capacity ("RFC") to occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk (with normal

---

[6]    It is unclear from the record what qualifications C. deFreitas holds.

breaks) for a total of 6 hours in an 8-hour workday, and sit (with normal breaks) for a total of

6 hours in an 8-hour workday (T249). It was noted that plaintiff had a "NORMAL

MUSCULOSKELETAL EXAM. NO CYANOSIS NOR RESP. DISTRESS LUNGS CLEAR

TO AUSCULTATION" (T249).

Due to plaintiff's asthma, it was noted that plaintiff should avoid concentrated

exposure to extreme cold, extreme heat, wetness, humidity, fumes, odors, dusts, gases, and

poor ventilation. (T251). However, plaintiff had no limitations regarding noise, vibration, or

hazards (id.). The assessment noted that, "CLMT DID NOT GIVE ANY SPECIFIC

PHYSICAL FUNCTIONAL LIMITATION" (id.).


### 2.    Educational Records and Testing

#### a.    School Psychologist Jennifer Topolski

Jennifer Topolski[7] of the Niagara Falls City School District completed an

evaluation dated March 3, 2000, stating that, "[plaintiff] is a ten-year-old fifth grade student

who is currently identified as educationally handicapped due to a learning disability" (T224).

Ms. Topolski's concluded that plaintiff

> "continues to struggle academically . . . since his last evaluation
> his behavior has improved but he still has a difficult time
> sustaining attention. On the current evaluation, [plaintiff]
> displayed borderline to below average ability. He displayed his
> intelligence equally through verbal expression and
> comprehension and through the manipulation of concrete
> nonverbal stimuli. Based on his ability and scores obtained on
> the last standardized achievement test administered [plaintiff]

---

[7]    It is unclear from the record what qualifications Jennifer Topolski holds.

continues to work significantly below expectancy. [Plaintiff's] classification appears appropriate. In addition, [plaintiff] seems to continue to need a small and structured environment to meet his educational needs" (T226).

### b. Woodcock-McGrew-Werder Mini-Battery of Achievement

Plaintiff was administered the Woodcock-McGrew-Werder Mini-Battery of Achievement on January 13, 2006 (T198). Plaintiff's performance on Basic Skills was noted as "comparable to that of the average individual at grade 3.7 from the normative sample", which is "within the very low range of scores obtained by others at his grade level" (T198-199). Plaintiff's performance on reading was noted as "comparable to that of the average individual at grade 2.7 from the normative sample", which is "within the very low range of scores obtained by others at his grade level" (id.). Plaintiff's performance on writing was noted as "comparable to that of the average individual at grade 2.9 from the normative sample", which is "within the very low range of scores obtained by others in his grade level" (id.). Plaintiff's performance on mathematics was noted as "comparable to that of the average individual at grade 6.7 from the normative sample", which is "within the low average range of scores obtained by others at his grade level" (id.).

### c. Individualized Education Program Records, Niagara Falls High School

Plaintiff's January 2, 2007 through January 2, 2008 Individualized Education Program ("IEP") notes state that he "has a significant delay in reading comprehension, math

concepts, written expression, which adversely affects academic performance" (T202). Among his need areas were to be able to follow oral and written directions (id.).

### d. Teacher Questionnaire, Ms. Jones[8]

On February 2, 2007, Ms. Jones, a special education teacher, completed a teacher questionnaire regarding plaintiff (T178-185). Ms. Jones noted that while plaintiff was in 12th grade, his current instructional levels were 3rd grade for reading and written language, and 7th grade for math (T178). She noted that he "struggles" in all academic areas other than math "due to his low reading ability", and that when a "task is slightly 'challenging' he attempts to avoid tasks" (T179, 180).

### e. Certified School Psychologist, Michael Lewis, Ph. D.

On April 16, 2007 plaintiff was seen by Dr. Lewis, who noted that "[p]revious evaluations indicate low average cognitive ability with significant deficits in academic achievement and adaptive behavior. [Plaintiff's] overall cognitive ability was measured to be in the range of below average to low average" (T255). Dr. Lewis noted plaintiff as having "weak academic skills when compared to the average student his age" ranging "from 5 grade levels below to 10 grade levels below expectations" (id.).

---

[8]      First name illegible (T185).

  **f.**  **Niagara County Community College ("N.C.C.C."), Unofficial Transcript**

  Plaintiff's unofficial transcript, dated January 14, 2008, shows a 0.00 GPA for the semester (T292).


  **3.**  **Vocational Evidence**

  **a.**  **Winship & Associates, Diagnostic Vocational Evaluation**

  Plaintiff was referred by Davina Moss-King, Ph.D., from Vocational and Educational Services for Individuals with Disabilities ("VESID") to Winship & Associates for a Diagnostic Vocational Evaluation on August 18, 2008 (T257-260). Tests measured plaintiff's reading score at the 2.0 grade equivalent (T258).

  Rhannon Yuscinsky, M.S. C.R.C., and Lisa Cooper, MS, CRC, noted that "[w]hen plaintiff initially presented for his evaluation, he stated an interest in RN, physical therapy, medical assistant and ambulance driver", but that in their opinion "further training would not be an appropriate direction for [plaintiff]" (T260). Instead, they recommended

> "that [plaintiff] continue in researching his vocational options. It would appear that a low stressful occupation that provides a structured environment that utilizes limited reading and math skills would be best. [Plaintiff] has shown some interest in the areas of Food Service, Animal Care and Personal Service. I would recommend that [plaintiff] go back into his interest test results to explore the options within those areas. Also, he could again explore his options within the medical field, but again, I would encourage him to be realistic as to what his abilities are to ensure that he chooses a vocational direction that not only matches with his interests but that he has the potential to be successful at" (id.).

In a September 18, 2008 addendum, it was noted that plaintiff wanted to become an ambulance driver, but that "it became evident that he was naive in regards to the job duties required of an ambulance driver" (T261). Plaintiff also discussed other driving positions, such as wheelchair van driver, stating that he would be having a driver evaluation in October 2008, and it was noted that this should provide a "clearer picture" of plaintiff's ability to work in this capacity (T261).

At this time, plaintiff was employed part-time as a "security/maintenance worker" with Parkway Apartments. Counselor Yuscinsky concluded that plaintiff,

> "needs to focus on obtaining or maintaining employment that is within his abilities and offers him the greatest chance for success. [Plaintiff's] ideas about returning to college or working for an ambulance company would likely be setting him up for failure. It is my opinion that [plaintiff] may be able to work in the capacity of a driver given that it is structured and low stress. Besides wheelchair van driver, another option that [plaintiff] could explore would be shuttle driver or courier. As stated previously, another option for [plaintiff] would be to participate in training to earn his New York State security guard's license to assist him in feeling more comfortable at his present job" (T262).

### b.   Davina Moss-King, Ph.D.

On December 23, 2008, Dr. Moss-King completed a "Medical Assessment of Ability to Do Work-Related Activities (Mental)" for plaintiff (T290-291)[9]. Dr. Moss-King rated plaintiff as "good" in his abilities to relate to coworkers, deal with the public, maintain personal appearance, behave in an emotionally stable manner, and demonstrate reliability; plaintiff was rated as "fair" in his abilities to follow work rules, use judgment, interact with supervisors, deal with work stresses, function independently, and relate predictably in social situations; and plaintiff was rated as "poor or none" in his abilities to maintain concentration, understand, remember, and carry out complex job instructions, and understand, remember, and carry out detailed, but not complex instructions (T290-291).

Plaintiff's "academic evaluations indicate there are severe deficits in the area of math, reading which will interfere w/ his ability to complete a task successfully in the area of employment . . . . [Plaintiff] does not handle stressful situations well and would not be successful in social situations that are not predictable w/ some uncertainty" (T290-291). Ms. Moss-King concluded that "[t]he evaluation results illustrate that [plaintiff] lacks the skill level & comprehension to successfully train on" (T291).

According to Dr. Moss-King's January 9, 2009 letter, plaintiff was attending remedial courses at N.C.C.C. during the Spring 2009 semester (T289). Dr. Moss-King also wrote that plaintiff is "currently reading at a second grade level and will need to receive

---

[9]     For this assessment, plaintiff's ability to function in different areas was rated from unlimited to very good, good (ability to function in this area is limited but satisfactory), fair (ability to function in this area is seriously limited, but not precluded), and poor or none (no useful ability to function in this area) (T290).

remedial assistance to be successful at employment or pursuing education endeavors", also noting that he "resigned from his maintenance position because his health was compromised" (id.).

### c. Driver Evaluation Summary Report, Walter Arbutina

VESID referred plaintiff for a driver evaluation on November 7, 2008, which concluded that he "appears to possess the potential to learn to become a safe, defensive driver. As a first time driver, [plaintiff] would benefit from proper individualized driver-training services" (T295).

### 4. Administrative Hearing Conducted On February 20, 2009

#### a. Mariam Lopez's Testimony

Ms. Lopez, plaintiff's mother, testified that her son had been living with her all of his life (T28). Plaintiff was on SSI when he was a child because he was deaf in his left ear, was a chronic asthmatic, and had behavioral and learning issues that required speech, occupational, and physical therapy (T32). She testified that VESID has been involved with plaintiff since high school and meets with him every two weeks (T37-38). According to Ms. Lopez, plaintiff is currently at a "[f]irst grade, second grade level" in terms of his math and reading (T38-39).

Ms. Lopez testified that plaintiff had stopped working as a maintenance worker at Parkway Towers after a few months because "[h]e kept on coughing a lot, getting asthma,

13

getting sick" (T29), and attributed plaintiff's illness to the chemicals they were using and to him being outdoors (id.).

Ms. Lopez testified that plaintiff is a chronic asthmatic on medication, but that he had been doing okay when he was in school (T29-30). She stated that plaintiff has arthritis in his feet, complains about back pains, and that his feet hurt when he stands or walks too much (T30). According to Ms. Lopez, plaintiff is depressed and locks himself in his room most of the time (T31). She testified that this depression became apparent to her when plaintiff failed his first semester at N.C.C.C., and when he was told that he could not be a pediatrician in high school (T31).

Ms. Lopez testified that she has to constantly repeat herself, tell plaintiff to focus, and remind him of things or he will forget (T33). She stated that plaintiff assists by doing dishes, taking out the garbage, and by attempting to cook and clean (T33). Ms. Lopez testified that plaintiff does not do a good job, "but he tries" (T34). For example, Ms. Lopez explained that she sends plaintiff to the grocery store and gives him a list verbally, but pretty much every time he has to call and get the list item-by-item because he forgets. Ms. Lopez also stated that he sometimes loses grocery money (T35). Ms. Lopez also shops with plaintiff for his clothing and drives him to school because he does not have a driver's license (T35, 40). Ms. Lopez stated that plaintiff recently took the road test and failed (T36-37). Plaintiff likes to play video games with his friends, hang out at his house, and occasionally goes to the movies (T39-41).

### b.     Plaintiff's Testimony

Plaintiff testified that when he was working for Parkway Towers he was exposed to chemicals from mopping and being outside when it was cold, which made him cough (T43), and quit this job to avoid becoming really ill (id.). He testified that he has not looked for work since leaving this job (T43, 44), and that VESID has not made any suggestions to him about jobs that he might be able to perform (T43-44).

Plaintiff testified that he took five classes during his semester at N.C.C.C., but failed every class and earned no credits (T48-49). He testified that he wanted to be an ambulance driver, but was unable to write a report, and that he could not be a security guard because he did not have an eighth or ninth grade writing and reading level (T49).

Plaintiff testified that he thought he would be too nervous to take public transportation by himself, and that he has never tried to do so (T45). He testified that he was trying to see if he could get his drivers license with the help of additional lessons (T50), but stated that he was having a difficult time focusing while driving, and that it was confusing for him (id.). He testified that driving makes him "a little scared", and that he sometimes forgets to do things like look in mirrors (T50-51).

Plaintiff testified that he has difficulty focusing in his daily life. For example, he has a difficult time reading a book on his own (T51). Plaintiff testified that his difficulty

focusing has resulted in complaints about his job performance (id.). He testified that he forgets to do things that his boss told him to do (id.).[10]

### 5. ALJ Straub's Decision

ALJ Straub found that plaintiff had not engaged in substantial gainful activity since August 28, 2007, due to the fact that plaintiff resigned from his only job after a few months, and this work activity did not rise to the level of substantial gainful activity (T15-16).

ALJ Straub found that since August 28, 2007, plaintiff has had the following severe impairments: learning disability and asthma (T16). However, since August 28, 2007, plaintiff has not had an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P. Appendix I (T16-17).

ALJ Straub found plaintiff has the RFC "to perform a full range of work at all exertional levels but with the nonexertional limitations: he cannot work in poorly ventilated areas or areas where he would be exposed to dust, fumes, humidity, dampness, or temperature extremes; and he can work only in a job involving simple directions and simple rote tasks in a low contact and low demand setting" (T18).

ALJ Straub concluded that considering plaintiff's age, education, work experience, and RFC, plaintiff is able to perform jobs that exist in significant numbers in the national economy (T20). ALJ Straub found that plaintiff's nonexertional limitations have "little or no effect on the occupational base of unskilled work at all exertional levels" and that

---

[10] The remainder of plaintiff's testimony matches his mother's testimony.

"a finding of 'not disabled' was therefore appropriate under the framework of section 204.00 in the Medical Vocational Guidelines" (id.).

## ANALYSIS

### A. Scope Of Judicial Review

The Social Security Act states that, upon review of the Commissioner's decision by the district court, "[t]he findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . " 42 U.S.C. §405(g). Substantial evidence is that which a "reasonable mind might accept as adequate to support a conclusion". Consolidated Edison Co. of New York, Inc. v. NLRB, 305 U.S. 197, 229 (1938).

Under this standard, the scope of judicial review of the Commissioner's decision is limited. This Court may not try the case *de novo,* nor substitute its findings for those of the Commissioner. Townley v. Heckler, 748 F.2d 109, 112 (2d Cir. 1984). Rather, the Commissioner's decision is only set aside when it is based on legal error or is not supported by substantial evidence in the record as a whole. Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998). If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support plaintiff's position and despite that the Court's independent analysis of the evidence may differ" from that of the Commissioner. Martin v. Shalala, 1995 WL 222059, *5 (W.D.N.Y. 1995) (Skretny, J.) (*quoting* Rosado v. Sullivan, 805 F. Supp. 147, 153 (S.D.N.Y. 1992)).

However, before deciding whether the Commissioner's determination is supported by substantial evidence, I must first determine "whether the Commissioner applied the correct legal standard." Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999). "Failure to apply the correct legal standards is grounds for reversal." Townley, 748 F.2d at 112.

## B.    The Disability Standard

The Social Security Act provides that a plaintiff will be considered disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §1382c(a)(3)(A). The impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . " 42 U.S.C. §1382c(a)(3)(B).

The determination of disability entails a five-step sequential evaluation process:

1.    The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.

2.    If not, the Commissioner considers whether the claimant has a 'severe impairment' which limits his or her mental or physical ability to do basic work activities.

3.    If the claimant has a 'severe impairment,' the Commissioner must ask whether, based solely on medical evidence, claimant has an impairment listed in

18

Appendix 1 of the regulations. If the claimant has one
of these enumerated impairments, the Commissioner
will automatically consider him disabled, without
considering vocational factors such as age, education,
and work experience.

4.      If the impairment is not 'listed' in the regulations, the
Commissioner then asks whether, despite the
claimant's severe impairment, he or she has residual
functional capacity to perform his or her past work.

5.      If the claimant is unable to perform his or her past
work, the Commissioner then determines whether there
is other work which the claimant could perform. The
Commissioner bears the burden of proof on this last
step, while the claimant has the burden on the first four
steps.

Shaw v. Chater, 221 F.3d 126, 132 (2nd Cir. 2000) (*citing* DeChirico v. Callahan, 134 F.3d

1177, 1179-80 (2nd Cir. 1998)); *see* 20 C.F.R. §§404.1520, 416.920.

"[R]egulations . . . limit the Commissioner's burden at step five. *See* 20

C.F.R. 404.1560(c) . . . The Commissioner's step-four RFC determination (with the claimant

bearing the burden of proof) now controls at both steps four and five . . . . The Commissioner

applies the RFC determination from step four to meet his burden at step five. Using the

claimant's RFC, the Commissioner must then show at step five that 'there is other gainful

work in the national economy which the claimant could perform.'" Spain v. Astrue, 2009

WL 4110294, *3 (E.D.N.Y. 2009).

Plaintiff moves for judgment on the pleadings, seeking "[a]t the very least"

that the case be remanded. Plaintiff's Motion [15-1], p. 24. He argues that ALJ Straub erred

by ignoring the opinion of Dr. Moss-King, failing to properly evaluate and explain the weight

afforded to the state agency review physician, ignoring certain of plaintiff's impairments,

19

failing to conduct a function-by-function RFC analysis, failing to utilize a vocational expert, and improperly assessing his credibility. Id., pp. 9-24. The Commissioner cross-moves for judgment on the pleadings, arguing that his determination is supported by substantial evidence. Commissioner's Memorandum of Law [17], pp. 17-25.

## C.     Plaintiff's Arguments

### 1.     ALJ Straub Erred in Failing to Explain Why he Afforded No Weight to the Medical Opinion of Dr. Moss-King

Plaintiff argues that ALJ Straub erred by failing to consider Dr. Moss-King's opinion because "Dr. Moss-King is not only a vocational expert, but also a psychologist by training" and "[a]s such, . . . is . . . a treating medical source." Plaintiff's Reply [18], p. 6; Plaintiff's Motion [15-1], pp. 9-12. The Commissioner responds that Dr. Moss-King is not an acceptable medical source since she was "not providing psychological treatment to plaintiff; rather, she was functioning in the capacity as a vocational rehabilitation counselor, as she stated under her signature". Commissioner's Reply Memorandum of Law [19], p. 2.

Even assuming that Dr. Moss-King was acting only in her capacity as a Vocational Rehabilitation Counselor, it did not entitle ALJ Straub to disregard her opinion without explanation. "[A] vocational rehabilitation counselor . . . is not an acceptable medical source under the regulations" (Deeley v. Astrue, 2011 WL 454505, *4 n. 1 (N.D.N.Y. 2011)), "but is an 'other source' as defined by 20 C.F.R. §1513(d)." Morris v. Astrue, 2010 WL 3976291, *17 (N.D. Fla. 2010), adopted, 2010 WL 3951961 (N.D. Fla. 2010). According to Social Security Ruling ("SSR") 06–03p, opinions from "other sources"

"are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." 2006 WL 2329939, *3. "While the opinion[s] [of other sources] do[] not command the same weight as a physician's, [they are] nevertheless entitled to some consideration." Marziliano v. Sullivan, 771 F.Supp. 69, 75 (S.D.N.Y. 1991).

"While the Commissioner is thus free to decide that the opinions of 'other sources,'. . . , are entitled to no weight or little weight, those decisions should be explained." Sears v. Astrue, 2012 WL 1758843, *3 (D.Vt. 2012). See SSR 06-03P, 2006 WL 2329939 at *6 ("the adjudicator generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case"). In evaluating the opinions of "other sources", "SSR 06–03p directs the Commissioner to use the same factors . . . as are used to evaluate the opinions of 'acceptable medical sources,' including treating physicians . . . . These factors include but are not limited to the length of the treatment relationship, the frequency of evaluation, and the degree to which the opinion is supported and consistent with the record." Id. (citing 2006 WL 2329939 at *4). In fact, "[b]ased on the particular facts of a case, such as length of treatment, it may be appropriate for an ALJ to give more weight to a non-acceptable medical source than a treating physician." Anderson v. Astrue, 2009 WL 2824584, *9 (E.D.N.Y. 2009).

I recognize that the ALJ has the discretion to "'choose between properly submitted medical opinions'" Balsamo, 142 F.3d at 81; see Veino v. Barnhardt, 312 F.3d

578, 588 (2d Cir. 2002). However, this decision should be explained. See Sears, 2012 WL 1758843 at *3. It was an abuse of discretion for ALJ Straub to entirely ignore Dr. Moss-King's December 23, 2008 Medical Assessment of Ability to Do Work Related Activities (T290-291).

The Commissioner appears to argue that this failure is harmless since Dr. Moss-King's "assessment does not contradict the ALJ's residual functional capacity finding . . . . that plaintiff was limited to performing jobs involving simple directions and simple rote tasks in a low contact and low demand setting". Commissioner's Reply Memorandum of Law [19], pp. 2-3. See, e.g., Ryan v. Astrue, 650 F.Supp.2d 207, 217 (N.D.N.Y. 2009) ("courts have found harmless error where the ALJ failed to afford weight to a treating physician when an analysis of weight by the ALJ would not have affected the outcome"). However, the RFC reached by ALJ Straub ignores Dr. Moss-King's assessment that plaintiff had poor or no ability to maintain attention and concentration, and that his "severe deficits . . . . will interfere w/ his ability to complete a task successfully in the area of employment" (T290-291), which, if credited by ALJ Straub, would have resulted in a more limited RFC. Dr. Moss-King's assessment has a significant bearing on ALJ Straub's RFC determination since "limitations to simple, routine tasks or to unskilled work would not, standing alone, typically suffice to account for a claimant's moderate limitations in concentration". Hudson v. Commissioner of Social Security, 2011 WL 5983342, *10 (D.Vt. 2011), adopted, 2011 WL 6002466 (citing Winschel v. Commissioner of Social Security, 631 F.3d 1176, 1180 (11th Cir. 2011)). See Bowers v. Astrue, 271 Fed.Appx. 731, 733 (10th Cir. 2008) ("Simple work . . . can be ruled out by a vocational expert on the basis of a serious impairment in

22

concentration and attention"). Therefore, I recommend that this case be remanded for the Commissioner to make findings regarding the weight, if any, to be assigned to Dr. Moss-King's assessment and to properly analyze the remaining steps of the sequential evaluation process in light of any changes made to the weight afforded to this assessment.[11]

### 2. ALJ Straub Erred in Evaluating the Opinion of the State Agency Physician

Plaintiff argues that ALJ Straub did not properly evaluate the opinion of the state agency physician when he merely stated, without any explanation, that he afforded significant weight to their opinions. Plaintiff's Motion [15-1], p. 13. Defendant responds that this was not erroneous because "no treating source proffered an opinion which was inconsistent with the ALJ's residual functional capacity finding". Commissioner's Reply Memorandum of Law [19], p. 5. I disagree.

As discussed above, ALJ Straub was free to credit the state agency review physician's RFC assessment over the contradictory assessment of Dr. Moss-King, but had an

---

[11] Since this may have an impact on whether vocational expert testimony is necessary, I have not analyzed plaintiff's argument (plaintiff's motion [15-1], pp. 18-20) directed at ALJ Straub's failure to utilize a vocational expert. See Mitchell v. Astrue, 2009 WL 3096717, *23 (S.D.N.Y. 2009) ("Limitations in concentration, persistence, and pace constitute nonexertional limitations under the Commissioner's regulations . . . . [O]nly if a claimant's nonexertional impairments 'significantly diminish his ability to work—over and above any incapacity caused solely from exertional limitations—so that he is unable to perform the full range of employment indicated by the medical vocational guidelines,' is the testimony of a vocational expert required").

obligation to explain his decision for doing so  Therefore, I recommend that the case be remanded on this basis.


3.     **ALJ Straub Erred in Failing to Assess Plaintiff's Adjustment Disorder, Depression, and Anxiety**

Plaintiff argues that  ALJ Straub erred in failing to include plaintiff's "depression, anxiety, or adjustment disorder in his short list of impairments, neither as severe or non-severe". Plaintiff's Motion [15-1], p. 15. Defendant responds that "[p]laintiff has not shown that additional limitations were caused by the other impairments he claims the ALJ should have found to be severe."  Commissioner's Reply Memorandum of Law [19], p. 6.

A severe impairment is an impairment or combination of impairments that "significantly limits [the claimant's] physical or mental ability to do basic work activities". 20 C.F.R. § 404.1520(c). "The analysis at this step may not accomplish more than screening out *de minimis* claims. If, however, the disability claim rises above the *de minimis* level, then the analysis must proceed to step three." Mattei v. Barnhart, 2003 WL 23326027, *6 (E.D.N.Y.2003) (*citing* Dixon v. Shalala, 54 F.3d 1019, 1030 (2d Cir.1995)).  Nevertheless, "the combined effect of a claimant's impairments must be considered in determining disability; the SSA must evaluate their combined impact on a claimant's ability to work, regardless of whether every impairment is severe." Dixon,  54 F.3d at 1031.

The record is replete with references to these additional impairments.  For example, Dr. Baskin diagnosed plaintiff with depressive disorder and anxiety disorder (T173), and  Dr. Balderman diagnosed plaintiff with depression (T163).  There is also

evidence in the record that at least some of these impairments were more than *de minimis*. For example, it was noted that plaintiff had been in therapy for depression for six years (T160) and was getting counseling to help with his anger (T142). There were also reports of plaintiff sleeping excessively (T170), loss of appetite with significant weight loss (id.), and frequent anger (T32-33).

Notwithstanding these references, ALJ Straub failed to discuss these impairments in his decision, including whether they constitute severe impairments or in combination with his severe impairments exacerbate his limitations. Therefore, I recommend that the case be remanded on this basis.

### 4.    Plaintiff's Remaining Arguments

Since the Commissioner fails to directly respond to plaintiff's arguments that ALJ Straub erred in failing to perform a function-by-function analysis in reaching his RFC determination (plaintiff's motion [15-1], pp. 17-18) and in failing to provide clear reasons for his assessment of plaintiff's credibility (id., pp. 20-23), I will recommend that the case be remanded on these grounds as well.

### CONCLUSION

For the following reasons, I recommend that the Commissioner's motion [16] for judgment on the pleadings be denied, that plaintiff's motion for judgment on the pleadings [15] be granted in part and denied in part, and that the case be remanded to the Commissioner for further proceedings consistent with this opinion.

Unless otherwise ordered by Judge Arcara, any objections to this Report and Recommendation must be filed with the clerk of this court by May 10, 2013 (applying the time frames set forth in Fed. R. Civ. P. ("Rules") 6(a)(1)(C), 6(d), and 72(b)(2)). Any requests for extension of this deadline must be made to Judge Arcara. A party who "fails to object timely . . . waives any right to further judicial review of [this] decision". Wesolek v. Canadair Ltd., 838 F. 2d 55, 58 (2d Cir. 1988); Thomas v. Arn, 474 U.S. 140, 155 (1985).

Moreover, the district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the magistrate judge in the first instance. Patterson-Leitch Co. v. Massachusetts Municipal Wholesale Electric Co., 840 F. 2d 985, 990-91 (1st Cir. 1988).

The parties are reminded that, pursuant to Rule 72(b) and (c) of this Court's Local Rules of Civil Procedure, written objections shall "specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection . . . supported by legal authority", and must include "a written statement either certifying that the objections do not raise new legal/factual arguments, or identifying the new arguments and explaining why they were not raised to the Magistrate Judge". Failure to comply with these provisions may result in the district judge's refusal to consider the objections.

Dated:   April 23, 2013

JEREMIAH J. MCCARTHY
United States Magistrate Judge